*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DOUGLAS SPOLYAR,

      Plaintiff-Appellant,

v

WILLIAM BEAUMONT HOSPITAL doing
business as BEAUMONT HOSPITAL-TROY,
MICHIGAN HEALTHCARE PROFESSIONALS,
P.C. doing business as OAKLAND NEUROLOGY
CENTER, ANDREA ROSSI, D.O., NORMAN
BURNS, M.D., JODI R. KRESCH, D.O.;
SKYWALK INTERNAL MEDICINE, P.C.,
NADHEER ISSA, M.D. and STEVEN DIMSDALE,
M.D..

      Defendants-Appellees.

UNPUBLISHED
May 25, 2023

No. 361041
Oakland Circuit Court
LC No. 2019-170817-NH
         2019-174073-NH

Before: PATEL, P.J., and CAVANAGH and REDFORD, JJ.

PER CURIAM.

In this medical malpractice case, plaintiff appeals as of right an order granting summary disposition in favor of defendants that was entered on the grounds that plaintiff's proposed medical expert testimony in support of his two theories of liability did not meet the standards set forth in MRE 702 and MCL 600.2955. We reverse and remand.

## I. BACKGROUND FACTS

This case arises from medical care that defendants rendered to plaintiff, a 35-year-old man, from July 4, 2016 through July 13, 2016, while a patient at William Beaumont Hospital – Troy. In short, plaintiff alleged that defendants failed to timely and properly diagnose and treat him for a cerebral vascular accident (CVA or "stroke") which resulted in plaintiff suffering additional, more catastrophic, strokes that left him permanently disabled. Plaintiff specifically claimed that defendants were negligent because he should have been administered aspirin, an antiplatelet therapy, throughout his hospitalization and he should have had timely blood vessel imaging so that

an endovascular surgical procedure, a thrombectomy, could have been performed to remove the thrombus or clot that subsequently caused his recurrent strokes. Plaintiff alleged that defendants' failure to implement these treatments caused his debilitating and permanent injuries. Ultimately, defendants argued that these theories of liability were not scientifically sound, and thus, could not support plaintiff's medical malpractice claims. The trial court agreed with defendants. A brief summary of the course of plaintiff's hospitalization and the procedural history of this case follows.

According to plaintiff's complaint, on July 4, 2016, at about 3:40 p.m., plaintiff was taken to the emergency department at defendant William Beaumont Hospital – Troy, with an altered mental state and was seen by defendant Dr. Steven Dimsdale. Plaintiff had a temperature of 103.3, and was noted to be confused and acting oddly. Plaintiff also appeared to be unable to move both eyes in the same direction and did not appear to move his eyes to the left. At 3:50 p.m., plaintiff's initial NIH Stroke Scale[1] score was 10, where a score between 5 and 15 is indicative of a moderate stroke. Dr. Dimsdale ordered a head CT scan and the result was reported as follows: "well-defined hypodensity is seen centered in the anterior right thalamus, concerning for an acute infarct."[2] At 4:23 p.m., plaintiff's NIH Stroke Scale score was 10 and a stroke alert was called. Dr. Dimsdale consulted with a neurologist, defendant Dr. Jodi Kresch. Plaintiff was admitted to the hospital under the care of an internal medicine specialist, defendant Nadheer Issa. Upon admission, plaintiff was given IV antibiotics for suspected meningoencephalitis and a lumbar spine puncture was to be performed to find the source of possible infection.

The next day, July 5, 2016, another neurologist, defendant Dr. Norman Burns, was consulted and he noted "mental status change – etiology. CSF [cerebrospinal fluid] suggestive of infectious process, MRI changes could be ischemic vs. inflammatory/infectious; also consider PRES [posterior reversible encephalopathy syndrome], though no history of HTN [hypertension] . . . ."[3] Eventually plaintiff was determined to have "negative" lab cultures. On July 11, 2016, a

---

[1] The NIH Stroke Scale (NIHSS) "is a tool used by healthcare providers to objectively quantify the impairment caused by a stroke . . . . The NIHSS is composed of 11 items, each of which scores a specific ability between 0 and 4. For each item, a score of 0 typically indicates normal function in that specific ability, while a higher score is indicative of some level of impairment. The individual scores from each item are summed in order to calculate a patient's total NIHSS score. The maximum possible score is 42, with the minimum score being a 0." https://en.wikipedia.org/wiki/National_Institutes_of_Health_Stroke_Scale (accessed April 17, 2023).

[2] The CT scan report also stated in the "Findings" section of the report: "Additional hypodensity is demonstrated in the right hippocampus. Large area of hypodensity involving the right occipital and portions of the parietal lobe." The "Impression" section of the report stated: "Findings are compatible with an acute to subacute right PCA territory infarct . . . ."

[3] An MRI of the brain was performed on July 5, 2016, and the report's findings stated: "There are areas of restricted diffusion [of] the parieto-occipital regions bilaterally, larger on the right (where there is also extension into the medial aspect of the temporal region), together with involvement of the thalami bilaterally (right greater than left), as well as a small focus of restricted diffusion within the left midbrain, consistent with areas of acute/subacute infarct. There is also a small

third neurologist, defendant Dr. Andrea Rossi, was consulted and, according to plaintiff's complaint, she noted that an "MRI confirmed multiple posterior circulation infarcts and possible vertebral-basilar artery disease." Dr. Rossi recommended that a CT angiogram be performed, the results of which noted a medical history of multiple strokes with vertebrobasilar irregularities; there was a thrombus in the basilar artery. A neurosurgery consultation was ordered on July 11, 2016, but by that time no viable neurosurgical or endovascular interventions could be safely offered to plaintiff. On July 13, 2016, plaintiff was transferred to William Beaumont Hospital – Royal Oak. He remained at that hospital until August 8, 2016, when he entered a rehabilitation center.

On May 21, 2019, plaintiff filed this medical malpractice case which arises out of the medical care and treatment he received, or did not receive, at William Beaumont Hospital – Troy, between July 4, 2016 and July 13, 2016. In Counts I, II, and VI of his complaint, plaintiff alleged that defendants William Beaumont Hospital – Troy, Michigan Healthcare Professionals, d/b/a Oakland Neurology Center, and Skywalk Internal Medicine were directly liable for failing to ensure they had competent staff, including neurologists and internal medicine physicians, to provide appropriate medical care, as well as proper policies and procedures in place. In Counts III, IV, and V, plaintiff alleged that defendants Drs. Rossi, Burns, and Kresch failed to take timely and appropriate actions as neurologists, including by performing proper testing, diagnosing that plaintiff was having a stroke, and initiating proper treatment like antiplatelet therapy and referring plaintiff to an interventional neuroradiologist. Plaintiff alleged that these neurologists were directly liable for their acts and omissions, and that defendant William Beaumont Hospital – Troy and defendant Michigan Healthcare Professionals, d/b/a Oakland Neurology Center, were vicariously liable for such negligence. In Count VII, plaintiff alleged that defendant Issa failed to take timely and appropriate actions as an internal medicine physician, including by performing proper testing, diagnosing that plaintiff was having a stroke, and initiating proper treatment and referring plaintiff to an interventional neuroradiologist. In Count VIII, plaintiff alleged that defendant Dimsdale failed to take timely and appropriate actions as an emergency medicine physician, including by performing proper testing, diagnosing that plaintiff was having a stroke, and initiating proper treatment. Plaintiff attached to his complaint an Affidavit of Meritorious Claim of Chitra Venkatasubramanian, a neurologist, as well as affidavits of merit from internal medicine and emergency medicine physicians.

On October 17, 2019, defendants Michigan Healthcare Professionals and its individually-named neurologists sought summary disposition on the ground that plaintiff's affidavit of merit authored by Dr. Chitra Venkatasubramanian (Dr. Venkat) failed to satisfy the requirements of MCL 600.2912d(1)(c), and thus, was insufficient to commence the lawsuit. On January 8, 2020, the trial court entered an order holding that the affidavit was sufficient and denying the motion for summary disposition.

---

superimposed intraparenchymal and subarachnoid hemorrhage within the right occipital region. Imaging findings raise the possibility of progressive reversible encephalopathy syndrome (PRES), and further evaluation with short-term follow-up MRI scanning would be helpful in this regard."

On September 17, 2021, a stipulated order of voluntary dismissal of defendant Dr. Steven Dimsdale, as well as emergency medicine claims, was entered by the trial court.

On January 31, 2022, defendants William Beaumont Hospital – Troy and Skywalk Internal Medicine sought partial summary disposition under MCR 2.116(C)(10), to dismiss plaintiff's direct liability claims, i.e., Counts I and VI of plaintiff's complaint, because they were unsupported by expert witness testimony. Plaintiff did not file a response to this motion and at oral argument on the motion indicated that it was uncontested. Accordingly, the trial court granted that motion and dismissed those claims.

On January 31, 2022, defendants William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa sought summary disposition of plaintiff's claims arising from his theory of liability that he would not have suffered recurrent strokes and would have had a better functional outcome if he had been treated with aspirin. Defendants argued that plaintiff's expert witness testimony in this regard, particularly testimony given by Dr. Venkat, Dr. Michael Gold, and Dr. Hiram Shah[4] was not supported by reliable scientific evidence, and thus, must be excluded under MRE 702 and MCL 600.2955. In particular, defendants argued, Dr. Venkat, Dr. Gold, and Dr. Shah testified that defendant neurologists violated the standard of care by not administering, and continuing to administer aspirin—an antiplatelet therapy—to plaintiff. And as a consequence of not administering aspirin, Dr. Venkat and Dr. Gold testified, plaintiff suffered three recurrent—or additional—strokes in his left midbrain, left thalamus, and left posterior cerebral artery. The scientific basis on which Dr. Venkat and Dr. Gold relied upon in support of their opinions[5] was an article entitled "Effects of aspirin on risk and severity of early recurrent stroke after transient ischaemic attack and ischaemic stroke: time-course analysis of randomised trials," authored by Peter M. Rothwell, et al, published in The Lancet, Vol 388 (July 23, 2016), pp 365-375 ("The Rothwell Study"). However, defendants argued, that article did not apply under the circumstances presented in plaintiff's case because plaintiff had already suffered a major stroke with residual neurological signs, as defined by the article, when he arrived to the hospital and, as the article stated, aspirin did not work greater than 50 percent of the time to prevent recurrent strokes in such cases. Accordingly, Dr. Venkat's and Dr. Gold's opinions as to aspirin were not admissible under MRE 702 and MCL 600.2955, and thus, defendants were entitled to summary disposition of claims arising from that theory of liability. In the alternative, defendants requested an evidentiary hearing to examine whether plaintiff's expert witness testimony comports with MRE 702 and MCL 600.2955.

On January 31, 2022, defendants William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa also sought summary disposition of plaintiff's claims arising from his theory of liability that he would not have suffered a second, larger stroke in his left midbrain if an endovascular procedure, specifically a thrombectomy, had been performed. Defendants argued that plaintiff's expert witness testimony in this regard, testimony given by Dr. Gregg Zoarski, was not supported by reliable scientific evidence, and thus, must be excluded under MRE 702 and

---

[4] Dr. Shah is an internal medicine physician, not a neurologist.

[5] Dr. Shah testified that he relied on his experience to support his opinion with regard to the administration of aspirin under these circumstances.

MCL 600.2955. In particular, defendants argued, Dr. Zoarski relied on medical literature that only concluded that randomized controlled trials needed to be done to determine the efficacy of thrombectomy in treating basilar artery and other posterior circulation strokes like plaintiff's in this case. In other words, a thrombectomy was not the standard treatment for posterior circulation strokes in July 2016 and the literature Dr. Zoarski relied upon does not support his opinion. Accordingly, Dr. Zoarski's opinions as to endovascular treatment, i.e., that a thrombectomy would have prevented a second left midbrain lesion and resulted in a better functional outcome for plaintiff, were not admissible under MRE 702 and MCL 600.2955. Therefore, defendants were entitled to summary disposition of claims arising from that theory of liability. In the alternative, defendants requested an evidentiary hearing to examine whether plaintiff's expert witness testimony comports with MRE 702 and MCL 600.2955.

On January 31, 2022, defendants Michigan Healthcare Professionals and its individually-named neurologists sought summary disposition on the ground that plaintiff's two theories of liability were unsupported by reliable scientific evidence as required under MRE 702 and MCL 600.2955, and thus, must be dismissed. First, defendants argued, plaintiff was not a candidate for an endovascular thrombectomy because such treatment had not shown any benefit for basilar artery thrombus and, moreover, plaintiff was outside the time window for endovascular therapy. Second, defendants argued, plaintiff should not have been kept on antiplatelet therapy like aspirin because such treatment is contraindicated when a hemorrhage has been identified as in plaintiff's case. In other words, either of plaintiff's experts' proposed treatments would have likely resulted in plaintiff's death and were not stroke protocols in 2016. Accordingly, defendants were entitled to summary disposition of this case or, in the alternative, at least an evidentiary hearing as to the admissibility of plaintiff's experts' opinions. Attached to defendants' motion were several exhibits, including plaintiff's medical records, several medical articles, and excerpts of the deposition testimony of defense expert neurologist Dr. Seemant Chaturvedi.

On February 2, 2022, defendants Michigan Healthcare Professionals and its individually-named neurologists filed a concurrence and joinder in the three motions for summary disposition filed by co-defendants' William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa, seeking the dismissal of plaintiff's two theories of liability, as well as plaintiff's direct liability claims.

On February 16, 2022, plaintiff filed a response to the motion for summary disposition of defendants William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa premised on the argument that plaintiff's experts' opinions as to the use of aspirin were unreliable, junk science. Plaintiff argued that the requirements of MRE 702 and MCL 600.2955 were satisfied. In particular, Dr. Venkat testified that any patient coming in to the hospital with an ischemic stroke should receive antiplatelet therapy to prevent recurrent strokes, regardless of the time frame. And as indicated by the Rothwell Study, providing aspirin to plaintiff would have resulted in a greater than 50 percent chance that the recurrent strokes would not have occurred. Although a petechial or small hemorrhage was identified in the MRI, there was only a low risk that aspirin would have affected it and the benefit of administering aspirin was so high that it outweighed that risk. Dr. Venkat clearly testified that the administration of aspirin was the standard of care under the circumstances when plaintiff arrived at the hospital and during his hospitalization before he suffered recurrent strokes. Further, Dr. Gold's expert opinion on the issue was consistent with Dr. Venkat's expert opinion. Dr. Gold also noted that a petechial hemorrhage is bleeding that occurs

after a non-hemorrhagic infarct and it is a secondary event, not the primary event. Dr. Shah also provided expert witness testimony consistent with that of Dr. Venkat and Dr. Gold, and Dr. Shah relied upon his extensive training and experience to support his opinion. Plaintiff argued that his experts relied not only on the Rothwell Study, but also on the "Yi Study" which was titled: "Low-molecular-weight heparin or dual antiplatelet therapy is more effective than aspirin alone in preventing early neurological deterioration and improving the 6-month outcome in ischemic stroke patients," authored by Xingyang Yi et al, published in the Journal of Clinical Neurology, 2015; 11(1):57-65. These two studies, plaintiff argued, were peer reviewed and published in highly regarded scientific journals and do not constitute "junk science." Accordingly, plaintiff's experts' opinions were reliable, meeting the requirements of MCR 702 and MCL 600.2955, and defendants were not entitled to summary disposition of claims arising from the theory of liability that plaintiff should have been treated with aspirin which would have prevented his recurrent strokes. In the alternative, plaintiff requested an evidentiary hearing so that the court could gauge the reliability of each expert's testimony.

On February 16, 2022, plaintiff filed a response to the motion for summary disposition of defendants William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa premised on the argument that plaintiff's expert opinions as to the appropriateness of endovascular interventions were unreliable, junk science. Plaintiff argued that the requirements of MRE 702 and MCL 600.2955 were satisfied. In particular, Dr. Zoarski testified that if plaintiff had undergone a thrombectomy on July 4, 5, or 6—as he should have—plaintiff would not have suffered from the large midbrain stroke and Dr. Zoarski supported his opinion with a number of articles that were applicable and reliable. Plaintiff cited to numerous medical articles that supported Dr. Zoarski's opinion regarding the efficacy and outcome in terms of achieving recanalization. As Dr. Zoarski testified, plaintiff had a greater than 80 percent chance of recanalization with mechanical thrombectomy. Although defendants' experts hold a different opinion, plaintiff argued, such difference of opinion does not establish unreliability sufficient to exclude expert witness testimony. Accordingly, Dr. Zoarski's opinions were reliable, meeting the requirements of MRE 702 and MCL 600.2955, and defendants were not entitled to summary disposition of claims arising from the theory of liability that plaintiff should have had a thrombectomy which would have prevented the large midbrain stroke. In the alternative, plaintiff requested an evidentiary hearing so that the court could gauge the reliability of Dr. Zoarski's expert's testimony.

On February 16, 2022, plaintiff also filed a response to defendants Michigan Healthcare Professionals and its individually-named neurologists' motion for summary disposition, arguing that plaintiff's two theories of liability—i.e., that the administration of aspirin and a thrombectomy would have prevented the recurrent strokes, including the large midbrain stroke—were sufficiently supported by reliable expert witness testimony, as discussed above. Therefore, this motion for summary disposition must be denied or, in the alternative, an evidentiary hearing should be held so that the reliability of plaintiff's experts' opinions could be demonstrated to the court.

On February 25, 2022, defendants Michigan Healthcare Professionals and its individually-named neurologists' filed a reply brief to plaintiff's response to their motion for summary disposition, reiterating that plaintiff's experts' opinions were not supported by reliable scientific evidence and must be excluded under MRE 702 and MCL 600.2955. Defendants argued that

plaintiff had a severe stroke at baseline, and thus, aspirin would not have helped and a thrombectomy was not an option in plaintiff's case.

On February 28, 2022, defendants William Beaumont Hospital – Troy, Skywalk Internal Medicine, and Dr. Issa filed reply briefs to plaintiff's responses to their motions for summary disposition, reiterating their arguments that there was no reliable scientific basis to support plaintiff's experts' opinions. In short, the Rothwell Study relied upon by plaintiff's experts shows that aspirin would likely not have reduced the risk of recurrent stroke in light of plaintiff's condition and the medical literature relied upon by Dr. Zoarski shows that a thrombectomy would likely not have prevented a second left midbrain lesion and would not have resulted in a better functional outcome for plaintiff. Therefore, there was no reliable scientific basis under MRE 702 and MCL 600.2955 to support plaintiff's experts' opinions and defendants are entitled to summary dismissal of plaintiff's claims.

On March 16, 2022, the trial court heard oral arguments on defendants' motions for summary disposition and the parties argued consistently with their briefs. In rendering its opinion from the bench, the trial court restated defendants' arguments that plaintiff could not show that defendants breached the standard of care by (1) failing to administer antiplatelet (aspirin) therapy during the course of hospitalization, and (2) failing to properly consider plaintiff as a candidate for endovascular intervention, and that such failures cost plaintiff the opportunity to achieve a more favorable outcome by more than 50 percent. The court indicated that an evidentiary hearing was not required in this case because it was clear from the testimony and numerous medical studies provided that plaintiff's experts' opinions were not reliable, including that such opinions were at times speculative or not supported by the statistical data presented in the studies relied upon.

The trial court discussed several medical articles relied upon by plaintiff's experts, first addressing several articles relied upon by plaintiff's expert Dr. Zoarski and distinguishing them from the facts of this case with regard to plaintiff's endovascular therapy theory of liability. The trial court then addressed the Rothwell Study relied upon by plaintiff's experts with regard to plaintiff's antiplatelet therapy theory of liability. The court noted that plaintiff's last-known-well-date was three days before presentation at the hospital and the Rothwell Study dealt with patients who presented less than 48 hours after a major acute stroke. Further, plaintiff presented with ten neurological deficits and, according to the terms of the article, he would likely be categorized as having had a severe, major stroke, and thus, would not have benefited from aspirin. But even if plaintiff had a mild or moderate stroke under the terms of the study, the relative benefit of the administration of aspirin was still less than 50 percent with regard to preventing recurrent strokes. The court concluded that the evidence presented by plaintiff, considered in the light most favorable to plaintiff, "simply does not meet the 51 percent threshold for [a] medical malpractice action when applied to plaintiff's circumstances." Therefore, defendants' motions for summary disposition were granted for the reasons they presented. Thereafter, on March 28, 2022, an order was entered granting summary disposition in favor of all defendants and dismissing plaintiff's case in its entirety. On April 15, 2022, plaintiff filed his claim of appeal.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND APPLICABLE LAW

We review de novo a trial court's decision on a motion for summary disposition. *Lakeview Commons v Empower Yourself, LLC*, 290 Mich App 503, 506; 802 NW2d 712 (2010). A motion brought under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim and should be granted if, after consideration of the evidence submitted by the parties in the light most favorable to the nonmoving party, no genuine issue regarding any material fact exists. *Id*. "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

In a medical malpractice case, the plaintiff must show: "(1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 492; 668 NW2d 402 (2003). As set forth in MCL 600.2912a(2):

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

"Expert testimony is required to establish the standard of care and a breach of that standard, as well as causation." *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012) (internal citations omitted).

To be admissible, expert testimony must be rendered by one qualified as an expert, be reliable under MRE 702, and meet the requirements of MCL 600.2955. In this case, defendants do not challenge the qualifications of plaintiff's expert witnesses, i.e., they are qualified as experts by "knowledge, skill, experience, training, or education[.]" MRE 702. However, defendants challenge the reliability of plaintiff's experts' opinion testimony under MRE 702 and claim that such testimony does not meet the requirements of MCL 600.2955.

Under MRE 702, an expert witness may render testimony only if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case." This rule requires that each aspect of the testimony be reliable. *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). "Under MRE 702, it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Id*. at 23, quoting *Edry v Adelman*, 486 Mich 634, 642; 786 NW2d 567 (2010). Further, "[a] lack of supporting literature, while not dispositive, is an important factor in determining the admissibility of expert witness testimony." *Elher*, 499 Mich at 23. And, as the *Elher* Court explained:

> MCL 600.2955(1) requires the court to determine whether the expert's opinion is reliable and will assist the trier of fact by examining the opinion and its

basis, including the facts, technique, methodology, and reasoning relied on by the expert, and by considering seven factors:

(a) Whether the opinion and its basis have been subjected to scientific testing and replication.

(b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, 'relevant expert community' means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation. [*Id*. at 23-24.]

In this case, defendants filed motions for summary disposition, arguing that the expert witness testimony plaintiff presented in support of his two theories of liability—the antiplatelet and endovascular theories—was not reliable and did not meet the requirements of MRE 702 and MCL 600.2955; therefore, plaintiff could not prove his claims and the case must be dismissed. The trial court agreed with defendants. We consider each theory of liability in turn.

## B. ANTIPLATELET THEORY OF LIABILITY

On appeal, plaintiff argues that the trial court erred in dismissing his claim that defendants breached the standard of care by failing to continue to administer aspirin, an antiplatelet therapy, which would have prevented the recurrent strokes that caused his debilitating injuries. We agree.

In support of this theory of liability, plaintiff primarily relied on two neurology experts, Dr. Venkat and Dr. Gold, both of whom testified that the failure to continue to administer aspirin after a single, initial dose was administered to plaintiff was a breach of the standard of care and the administration of aspirin more likely than not would have prevented the recurrent strokes that plaintiff suffered. We consider their testimony separately.

### 1. DR. VENKAT'S TESTIMONY

Dr. Venkat, who is board certified in neurology, has a subcertification in vascular neurology, and is a full-time clinical professor at Stanford University, testified that plaintiff

presented to the emergency room on July 4, 2016 with symptoms of a stroke which, according to the CT scan, likely occurred at least 12 to 24 hours before arrival. The CT scan on July 4, 2016 showed a right thalamic stroke and a right posterior cerebral artery (PCA) stroke. No hemorrhage was seen on the CT scan. The neurological deficits that plaintiff exhibited in the emergency room were vision loss on the left side visual field and minimal left arm drift. Plaintiff was determined to be a 9 on the NIH Stroke Scale. The cause of plaintiff's stroke was unknown but irrelevant to treatment. Plaintiff's last-known-well-date was documented to be three days before arrival in the emergency room. Plaintiff was administered one dose of aspirin, which is an antiplatelet, but that was discontinued. In the absence of antiplatelet therapy, thrombus accumulates and grows; therefore, plaintiff—who had an ischemic stroke, should have been continued on aspirin therapy to prevent recurrent strokes regardless of the timing of the strokes.

On July 5, 2016, plaintiff's NIH score was fluctuating between an 8 and 9. An MRI was performed on July 5, 2016, which confirmed the right thalamic stroke and the right PCA stroke, but also showed a new left PCA stroke, a new small stroke in the left thalamus, and a new small stroke in the left midbrain. It was unknown if the new areas of infarct were "new" or just the result of better imaging. The MRI also revealed petechial hemorrhages which were small and related to the preexisting right PCA stroke. When one has a stroke, the damage can cause some leaking of tiny amounts of blood within a prior ischemic stroke which is of no clinical significance. In other words, plaintiff's was not a primary or spontaneous intracerebral hemorrhage and antiplatelet therapy was not contraindicated. However, on July 6 and July 7, plaintiff began experiencing new neurological issues, including diplopia, blurred vision, gaze problems, and crossed eyes. It was at this time that plaintiff suffered a recurrent stroke which expanded the tiny left midbrain stroke—which would not have caused lasting deficits—into a much larger left midbrain stroke. But an MRI was not performed until July 10, 2016, which detected the new left midbrain stroke.

Despite significant evidence of strokes concerning the posterior circulation, no blood vessel imaging was performed until July 10, 2016. Therefore, while plaintiff may have had a basilar artery occlusion—partial or complete—when he presented to the emergency room on July 4, it is impossible to know for sure because no vessel imaging, i.e., either a CTA or MRA, was performed until several days later on July 10, 2016. A physician can only diagnose a basilar artery occlusion if there is blood vessel imaging, after which a neurointerventionalist would be consulted if a clot is identified. That is, if blood vessel imaging would have been done and if a clot had been seen, that clot may have been able to be removed which would have prevented plaintiff's recurrent strokes.

On July 10 and July 11, plaintiff had additional neurological issues, including a headache and was becoming nonverbal with worsening neurological status—which corresponded with the new large and debilitating left thalamic stroke that occurred on July 12 or July 13, 2016. According to Dr. Venkat, that left thalamic stroke "basically wiped him out and is responsible for the majority of the residual deficits" that plaintiff continues to experience. This stroke coincided with a jump in plaintiff's NIH Stroke Scale score that was seen on July 12 and July 13. On July 13, 2016, plaintiff was transferred to Beaumont – Royal Oak, and he was given aspirin during that hospitalization but plaintiff had already had the debilitating left thalamic stroke—which first showed up on a CT scan taken on July 14 because no imaging was done on July 12 or July 13. Further, an MRA from July 19 was significantly different than the MRA from July 10. The July 10 MRA showed that there was still flow in the posterior cerebral arteries while the MRA of July 19

showed an extensive clot in the top of the basilar artery and no flow in the PCA arteries on either side.

Dr. Venkat opined that plaintiff's subsequent or recurrent strokes that occurred *after* his admission to the hospital on July 4 were the result of thrombus growing and extending into the perforator arteries because no antiplatelet therapy was being administered to plaintiff during this hospitalization despite worsening of his neurological symptoms. If plaintiff had been continued on aspirin—instead of aspirin being discontinued after the first initial dose, "the clot would not have propagated and would not have picked off more perforators and caused additional strokes." In other words, plaintiff would not have had the several recurrent strokes that occurred, including the left thalamic stroke that was responsible for most all of his residual deficits. And the administration of aspirin is not time-dependent or time-sensitive so any time a patient comes in with an ischemic stroke, they get antiplatelet therapy like aspirin to prevent recurrent strokes. The efficacy of antiplatelet therapy in the long term, like after the first six weeks following a stroke, is reduced with regard to preventing recurrent strokes.

Dr. Venkat explained that she was relying on an extensive body of literature that had been around for 50 years in support of her opinion that aspirin would have prevented plaintiff's recurrent strokes, but she provided two publications that were representative of the body of medical articles that speak about antiplatelet efficacy. The Rothwell Study is one which speaks to the efficacy of aspirin in mild and moderate strokes—in preventing recurrent strokes in the first six weeks. This Study applied to plaintiff who had, at best, a moderate stroke upon presentation to the emergency room. The guidelines from the American Heart Association and American Stroke Association, i.e., AHA/ASA, also characterize such treatment as a Level 1A recommendation—to give antiplatelets to someone who presents with an ischemic stroke. These guidelines provide a roadmap for what a reasonable neurologist should be doing.

Specifically, with regard to the Rothwell Study, Dr. Venkat testified that because plaintiff had an ischemic stroke, he would have been included in the trials of antiplatelet medications like aspirin. "The Rothwell paper collected 12 different studies . . . looking at the short-term benefit of preventing recurrent strokes with aspirin." Dr. Venkat quoted three pertinent paragraphs from the article; first, on page 368 of the paper: "Aspirin also reduces severity of recurrent ischemic stroke during the six weeks after randomization. Consequently, aspirin reduced the six-week risk of disabling or fatal stroke, i.e., modified ranking score of more than two, by about 70 percent." Second, on page 368 of the article: "Aspirin reduced the six-week risk of disabling or fatal ischemic stroke by about 70 percent, and the risk of very severe ischemic stroke by about 75 percent." And, third, on page 371: "On pooled analysis of recurrent ischemic stroke in patients with mild and moderately severe initial deficits, no effect was found, no effect of aspirin was found within the first 24 hours after randomization, but the risk was reduced by day two;" that risk was reduced by 56 percent by day two and by day three the risk was reduced by 69 percent, and during days 4 to 6 the risk was reduced by 55 percent. The second article Dr. Venkat provided was called: "Low molecular weight heparin or dual antiplatelet therapy is more effective than aspirin alone in preventing neurological deterioration and improving the six-month outcome in ischemic stroke patients." Dr. Venkat agreed that plaintiff would not have met all of the inclusion criteria for that study, but her purpose in providing the article was to show that if aspirin had been continued and for some random reason had failed, then there were other options available.

## 2. DR. GOLD'S TESTIMONY

Dr. Gold, a practicing attending physician who has been board certified in adult neurology since 1985 and is also an associate clinical professor at UCLA in neurology, substantially agreed with Dr. Venkat about the clinical course of plaintiff's hospitalization and, for the sake of brevity, will not be repeated here unless distinguishable or particularly relevant. Dr. Gold testified that all strokes in general are more common in the anterior circulation than in the posterior circulation and plaintiff's strokes occurred in the posterior circulation. Dr. Gold opined that mechanical thrombectomies have been a treatment option for posterior circulation strokes for many decades and they are commonly performed. He did not believe that there was an absolute window of time or time limit for treatment by a thrombectomy; it would depend on the stroke disorders that were present and a neurointerventionalist would determine the safety of that intervention in the circumstances presented based on their experience and clinical judgment. Dr. Gold agreed with Dr. Venkat that plaintiff's stroke as of July 4 and July 5 was mild to moderate. The etiology of the stroke was unknown—which is common, even in a person who was plaintiff's age.

Dr. Gold testified that plaintiff had an additional stroke in the region of his left midbrain around July 6 or July 7, which produced double vision, and then he had a left thalamic stroke on July 12, which caused a marked deterioration of his neurological status—his speech and level of consciousness—on that day, and resulted in severe and permanent disabilities. An MRI on July 19 showed the new left thalamic stroke. Dr. Gold opined that all of the neurologists who treated plaintiff violated the standard of care because no one put him on any treatment for stroke other than in the first 24 hours where he was given an aspirin. "My standard of care criticism is failure to involve – to offer any treatment whatsoever for stroke. Aspirin was started and it was discontinued, no interventional radiologist was consulted. He was not given any treatment for stroke." Plaintiff "should have been treated with an antiplatelet agent. Aspirin would have been a choice. It would have been a choice. He should have undergone angiography to determine why he had a stroke, and an interventionalist needed to be involved." Either CT or MR angiography should have been done on July 4 or on July 5 to determine the etiology of plaintiff's neurologic deficits and may have showed that thrombectomy was a treatment option. Dr. Gold thought that diminished blood flow or partial occlusion of the vertebrobasilar system caused by a blood clot located before the bifurcation of the basilar artery into the posterior cerebral arteries would have been demonstrated by a CTA or MRA performed on July 4 or July 5, but one was not performed. The MRA that was performed on July 26 showed that there was no blood flow in either the distal basilar artery or in the bilateral posterior cerebral arteries, while the MRA performed on July 10 showed that there had been blood flow—albeit diminished, or slow, flow.

Dr. Gold believed that the Rothwell Study was an important demonstration of the efficacy of aspirin in patients who have had a stroke to prevent recurrent strokes. And based on the Rothwell Study, Dr. Gold was of the opinion that if plaintiff had been continued on aspirin throughout his hospitalization, it is more probable than not that plaintiff would not have developed the subsequent and debilitating left midbrain and left thalamic strokes. Dr. Gold acknowledged that aspirin could be contraindicated when there are certain types of intracranial hemorrhage but it depends upon the nature of it, including the size, location, and description. While plaintiff's MRI of July 5 indicated that there were hemorrhages seen, the hemorrhages were petechial hemorrhages which "occur[] after an infarct, after a nonhemorrhagic infarct. It's a bleeding that occurs following an infarct, it's not the primary event. It's a secondary event." Plaintiff did not have a

-12-

hemorrhagic stroke which is a primary brain hemorrhage that causes the stroke, not a secondary event. It is the primary rupture of a blood vessel that causes bleeding in the brain. That is not what plaintiff had; he had a nonhemorrhagic stroke that then developed some aspects of blood associated with it but that is common with nonhemorrhagic strokes. Therefore, aspirin would have been appropriate treatment for plaintiff. In other words, any risk associated with giving aspirin to plaintiff was outweighed by the potential benefit of not having a severely disabling stroke—which is what happened in this case because he was not given aspirin.

To summarize, Dr. Gold opined that the standard of care was breached by defendants' failure to continue to administer aspirin to plaintiff, failure to order timely additional imaging like angiography, and failure to consult an interventional neuroradiologist with regard to plaintiff's care and treatment. It was Dr. Gold's opinion within a reasonable medical probability that as a consequence of these failures, plaintiff has permanent neurological injury today. Plaintiff cannot live on his own; he requires the care of others to survive and maintain his health.

## 3. SUMMARY DISPOSITION

Defendants filed motions for summary disposition challenging the scientific basis for Dr. Venkat's and Dr. Gold's opinions that aspirin should have been given to plaintiff throughout his hospitalization which would have prevented plaintiff's recurrent and debilitating strokes, thereby breaching the standard of care and depriving plaintiff of the opportunity to achieve a more favorable outcome by more than 50 percent. Both doctors provided expert opinions on these issues that were based on their specialized education, training, and extensive experience as practicing neurologists who were also professors of neurology at major universities. They also relied on medical articles, with Dr. Venkat testifying that she was relying on an extensive body of literature that had been around for 50 years in support of her opinion regarding the efficacy of aspirin but only provided a couple of publications that were representative of the body of such medical articles. One of those publications was the Rothwell Study, which the trial court concluded did not, in fact, support Dr. Venkat's or Dr. Gold's opinions that, had plaintiff been given aspirin throughout his hospitalization, he had a better than 50 percent chance of not suffering the recurrent strokes that caused his injuries.

Upon review of the Rothwell Study, we disagree with the trial court's interpretation and conclusion. The Rothwell Study pooled data for 15,778 participants from 12 trials of aspirin treatment groups versus control treatment groups in secondary prevention of recurrent stroke after transient ischemic attack (TIA) or ischemic stroke. The "Findings" of the Study stated: "Aspirin reduced the 6 week risk of recurrent ischaemic stroke by about 60% . . . and disabling or fatal ischaemic stroke by about 70% . . ., with greatest benefit noted in patients presenting with TIA or minor stroke . . . ." That is, for patients presenting with TIA or minor stroke, aspirin reduced the risk of disabling or fatal recurrent stroke by about 80%. The Study specifically noted that "[t]hese effects were independent of dose, patient characteristics, or aetiology of TIA or stroke."

Despite these "Findings" of the Study, defendants argued in their motion for summary disposition that Dr. Venkat's reliance on these findings was untenable because the Study also discussed data derived from the stratification of test subjects by severity of stroke deficits at the initiation of therapy, i.e., at baseline, and concluded that the results were not as favorable. The Study states: "Aspirin reduced the 14 day risk of recurrent ischaemic stroke in participants with

mild neurological deficits at baseline, with a consistent effect across trials, but had no effect in those with severe deficits at baseline[.]" Further, "[i]n participants with moderately severe deficits, there was a significant overall reduction in risk, but there was heterogeneity between trials[.]" The Study did not give specific percentage values with regard to each group with mild, moderate or severe deficits, perhaps because of the heterogenous nature of the comparable variables, but the Study did provide hazard ratios and associated confidence intervals which describe the relative risk of recurrent stroke with aspirin treatment. The Study stated: "On pooled analysis of recurrent ischaemic stroke in patients with mild or moderately severe initial deficits, no effect of aspirin was found within the first 24 h … after randomisation, but risk was reduced by day 2 (HR 0.44, 95% CI 0.25-0.76, p = 0.0034) and day 3 (0.31, 0.16-0.58, p = 0.0003), with further reduction during days 4-6 (0.45, 0.31-0.67, p <0.0001) and days 7-14 (0.86, 0.58-1.27, p = 0.45)." Based on the stated hazard ratios, Dr. Venkat testified that the relative risk of recurrent stroke was reduced by 56% after day two [1.0 - .44]; by day three the risk was reduced by 69% [1.0 - .31]; and during days 4 to 6, the risk was reduced by 55% [1.0 - .45]. Thus, aspirin reduced the relative risk of recurrent ischemic stroke by more than 50% in patients with mild or moderately severe initial deficits after the first 24 hours. And when plaintiff arrived at the emergency room on July 4, 2016, he had an NIH Stroke score of 10, where a score between 5 and 15 is indicative of a moderate stroke and which is also consistent with the deficit parameters of the Study. Consequently, Dr. Venkat's conclusions were supported by and consistent with the Study's "Findings" that "Aspirin reduced the 6 week risk of recurrent ischaemic stroke by about 60% . . . and disabling or fatal ischaemic stroke by about 70% . . ., with greatest benefit noted in patients presenting with TIA or minor stroke . . . ." Therefore, the Rothwell Study did support Dr. Venkat's and Dr. Gold's opinions that, had plaintiff been given aspirin from day two of his hospitalization, he had a better than 50 percent chance of not suffering the recurrent strokes that caused his injuries.

While defense expert Dr. Seemant Chaturvedi testified that he disagreed with Dr. Venkat's and Dr. Gold's interpretation of the Rothwell Study data, he also testified that he too treats stroke patients with aspirin—and he does so even when there is a risk of bleeding in the brain. Dr. Chaturvedi gave an example as to how he would explain to a patient or a patient's family his treatment as follows: "So if somebody comes into our hospital with a stroke and atrial fibrillation a lot of times we'll hold the anticoagulant for about a week to reduce the risk of bleeding in the brain but eventually we'll want that patient to go on anticoagulants and so I don't necessarily tell the family that I'm withholding the anticoagulant for one week because of the risk of hemorrhagic transformation, I tell them that this is a stroke, we're going to use aspirin initially, later we'll place him on anticoagulant but I don't necessarily tell them the thought process behind each of these steps." If aspirin was not the standard of care in treating acute stroke patients, Dr. Chaturvedi would not have discussed treating his hypothetical patient with aspirin.

And in his deposition Dr. Chaturvedi agreed that the standard of care in 2016 required that a patient with an ischemic stroke be given aspirin within 48 hours when there is no hemorrhage present and when it was not a cardioembolic stroke. It appears that Dr. Chaturvedi's criticism of Dr. Venkat's reliance on the Rothwell Study was based, at least in part, on his misinterpretation of her testimony, as evidenced by his testimony that "if someone were to claim that based on this article a patient would have 60 percent chance of improvement simply with aspirin I don't think that's a reliable opinion." But that is not the claim; rather, the claim by Dr. Venkat and Dr. Gold is that aspirin would have significantly reduced the risk of recurrent stroke such that plaintiff had a better than 50 percent chance of not suffering the recurrent strokes that caused his injuries. They

-14-

did not claim that aspirin would have improved the damage already done by the initial strokes that plaintiff suffered; they claimed aspirin would have more likely than not prevented further damage and decline caused by additional strokes.

As this Court has often explained, Michigan evidentiary law incorporates the requirements set forth in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008). And while the proponent of expert testimony must establish its reliability, neither *Daubert* nor MRE 702 require the trial court, as gatekeeper, "to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217 (quotation marks and citation omitted).

> Instead, the proper role of the trial court is to filter out expert evidence that is unreliable, not to admit only evidence that is unassailable. The inquiry is not into whether an expert's opinion is necessarily correct or universally accepted. The inquiry is into whether the opinion is rationally derived from a sound foundation. The standard focuses on the scientific validity of the expert's methods rather than on the correctness or soundness of the expert's particular proposed testimony. An expert's opinion is admissible if it is based on the methods and procedures of science rather than subjective belief or unsupported speculation. [*Id*. at 217-218 (internal quotation marks and internal citations omitted).]

In this case, for the reasons discussed above, we conclude that the proposed expert witness testimony of Dr. Venkat and Dr. Gold in support of plaintiff's antiplatelet theory of liability met the standards set forth in MRE 702 and MCL 600.2955. In other words, plaintiff may pursue his theory that defendants breached the standard of care by failing to continue to administer aspirin and the administration of aspirin more likely than not would have prevented the recurrent strokes that caused plaintiff's debilitating injuries. Therefore, the trial court erred in granting defendants' motions for summary disposition premised on the argument that plaintiff's experts' opinions as to the use of aspirin were unreliable junk science and must be excluded under MCR 702 and MCL 600.2955. Accordingly, we reverse the trial court's dismissal of plaintiff's claims arising from his antiplatelet theory of liability and remand for further proceedings on this matter.

## C. ENDOVASCULAR THEORY OF LIABILITY

On appeal, plaintiff argues that the trial court erred in dismissing his claim that defendants breached the standard of care by failing to consult with a neurointerventionalist to perform an endovascular procedure which more likely than not would have prevented the recurrent strokes that caused his debilitating injuries. We agree.

### 1. DR. ZOARSKI'S TESTIMONY

In support of this theory of liability, plaintiff primarily relied on neuroradiologist and neurointerventional surgeon Dr. Gregg Zoarski, who testified that the standard of care in this case required that a vascular study like a CT angiogram be performed after the CT scan of July 4, 2016 showed a basilar artery occlusion, and then a thrombectomy should have been performed which would have removed the clot and prevented the recurrent strokes that plaintiff suffered. Dr.

Zoarski substantially agreed with Dr. Venkat's and Dr. Gold's testimony regarding the clinical course of plaintiff's hospitalization and, for the sake of brevity, will not be repeated here unless distinguishable or particularly relevant.

Dr. Zoarski provided testimony about the devices and techniques used for endovascular revascularization, i.e., via aspiration or stent retrievers, and opined that several articles demonstrated the success rate of revascularization to be about 80 to 85 percent. While most of those articles related to anterior circulation strokes—and plaintiff's strokes involved the posterior circulation, Dr. Zoarski testified that "there are no randomized controlled studies in the posterior circulation, but there are studies in the posterior circulation that have also shown approximately 80 percent revascularization with the use of aspiration and stent retrievers." Dr. Zoarski testified that attempts to do randomized controlled studies related to posterior circulation strokes, like those caused by basilar artery occlusion, have been frustrated because people who are assigned to a "no treatment" group or to a "medical management" group drop out of the study when they are told they will not undergo endovascular revascularization. One article called "Outcomes of Endovascular Treatment of Basilar Artery Occlusion in the Stent Retriever Era: A Systematic Review and Meta-Analysis," authored by Kevin Phan, et al, and published in the Journal of Interventional Surgery in 2015, showed that there was an 80 percent recanalization rate with stent retrievers for basilar artery occlusion. Dr. Zoarski testified that in his experience it was at least an 80 percent success rate in any large vessel occlusion in the brain and it did not matter if the occlusion was in the anterior or posterior circulation. However, he agreed that the issue of revascularization does not necessarily equate with better functional outcome. And in that article, despite the high rate of recanalization, thrombectomy resulted in a favorable functional outcome rate of 42.8 percent. A second article was discussed by Dr. Zoarski called "Intra-arterial Thrombolytic Therapy Improves Outcome in Patients With Acute Vertebrobasilar Occlusive Disease, authored by Werner Hacke, and published in the Journal of Stroke in 1988. That article involved recanalization via intra-arterial thrombolytic therapy, not mechanical thrombectomy, but it illustrated that of 19 patients who were recanalized, 10 of those had favorable outcomes.

Dr. Zoarski explained that many of the articles that defense counsel was referencing in his deposition were articles that Dr. Zoarski provided to plaintiff's counsel just for informational purposes[6] and were not necessarily articles that he planned on relying on to support his opinions in this case. He said that he had other articles that he could discuss that were more specifically relevant, but there were not many on posterior circulation as he stated earlier. Dr. Zoarski cited to an article called "Local Intraarterial Thrombolysis and Vertebrobasilar Thromboembolic Disease," authored by H. Zeumer, and published in the American Journal of Neuroradiology in 1983. That article looked at five patients who underwent revascularization for basilar artery occlusions of various duration via a thrombolytic agent. Three of the five patients had improvement of functional disturbances and further ischemic necrosis was prevented. Another article called "Mechanical Recanalization in Basilar Artery Occlusion: The ENDOSTROKE Study," authored by Oliver Singer et al, and published in Annals of Neurology in 2015, involved mechanical revascularization of 148 patients with basilar artery occlusion. Seventy-nine percent of those patients were recanalized, and 76% had good to moderately good clinical outcomes An article that

---

[6] Some of those articles were published years after plaintiff's hospitalization.

-16-

Dr. Zoarski relied on to "show the extended time windows for the posterior circulation compared with the anterior circulation" with regard to treatment was called "Thrombolytic Therapy for Thomboembolism of Vertebrobasilar Artery," authored by G.G. Nenci, and published in Angiology in 1983. That article involved four patients with vertebrobasilar artery occlusion who were treated with thrombolytic agents between 16 and 44 hours after symptoms appeared and three of the four patients made almost a complete recovery. This study demonstrated that, unlike in the case of anterior circulation strokes, patients with posterior circulation strokes do not have a fixed time window in which treatment via thrombectomy should occur; rather, it depends on the patient's clinical picture and condition.

Dr. Zoarski testified that all of the strokes appearing on plaintiff's July 4, 2016 CT scan related to the occlusion of the distal basilar artery. The likely reason the lesions in plaintiff's brain got bigger over time was persistent and progressive occlusion of perforating arteries in the absence of treatment of the thrombus that was in the basilar artery. By the time of the July 11, 2016 CT angiogram, Dr. Zoarski believes the basilar artery was completely occluded. Dr. Zoarski stated that in 2016, at the time that plaintiff was being treated, the standard of care was to treat a basilar artery stroke with a thrombectomy. The only reason there were not randomized clinical trials demonstrating the efficacy of this treatment was that patients did not want to be in the non-thrombectomy group. Dr. Zoarski emphasized that the absence of a study did not mean that it was not the standard of care in practice. And guidelines do not establish the standard of care. There is no particular publication that establishes the standard of care for the issue of basilar occlusion. Dr. Zoarski was basing his expert opinion on medical articles, but also on 20 years of academic practice and 10 years at a large stroke center where he performed dozens and dozens of thrombectomies in posterior circulation cases.

In plaintiff's case, Dr. Zoarski testified, the standard of care required that a vascular study be performed after the CT scan on July 4, 2016 showed a basilar artery occlusion and then plaintiff should have had a thrombectomy, which had an 80% or greater likelihood of recanalizing the basilar artery. If recanalization had occurred, plaintiff more likely than not would have had a better functional outcome because the subsequent larger left midbrain stroke would have been prevented. The main risk of thrombectomy on July 4 or July 5, 2016 would have been the risk of hemorrhage related to the procedure or to revascularization but that occurred in less than ten percent of cases and, realistically, that occurred in only three to five percent of cases.

## 2. SUMMARY DISPOSITION

Defendants filed motions for summary disposition challenging the scientific basis for Dr. Zoarski's opinions that a thrombectomy should have been performed on plaintiff early in his hospitalization which more likely than not would have prevented plaintiff's debilitating strokes. In other words, that defendants breached the standard of care and deprived plaintiff of the opportunity to achieve a better functional outcome by more than 50 percent. Defendants argued that Dr. Zoarski's opinions were unreliable because the medical literature he relied upon did not prove the efficacy of thrombectomy in treating basilar artery and other posterior circulation strokes like plaintiff's in this case. In granting defendants' motion for summary disposition, the trial court agreed with defendants that the medical articles were not supportive of Dr. Zoarski's opinion, apparently because they did not consist of randomized controlled studies involving mechanical thrombectomies in basilar artery strokes.

It is generally not sufficient to point to an expert's experience and background to support a claim that an expert's opinion is reliable. *Elher*, 499 Mich at 23. And it is true that a lack of supporting literature is an important factor in determining the admissibility of expert testimony, although it is not dispositive. *Id*. There simply may not be scientific or medical literature on every specific medical issue that can arise, but the proponent of such expert testimony must still present a means to objectively and independently validate that the expert opinion is based on reliable principles or methods. See MRE 702; *Edry*, 486 Mich at 641.

In this case, Dr. Zoarski provided several medical articles that included studies which involved the removal of thrombus in the basilar artery either through thrombolytic agents and/or mechanical thrombectomy. While Dr. Zoarski could not provide very many studies on mechanical thrombectomy specifically, he explained that they simply did not exist although that procedure was routinely being performed. The medical literature Dr. Zoarski relied upon tended to support his expert opinion that thrombus in the basilar artery could successfully be removed, recanalization achieved, and a good to moderately good functional outcome was more likely than not to result from the intervention. The trial court appears to have primarily discredited Dr. Zoarski's testimony as unreliable because the articles that were available at the time of plaintiff's stroke in July 2016 were not randomized controlled studies and they primarily utilized thrombolytic agents to recanalize the basilar artery—not an endovascular procedure. But the ENDOSTROKE Study did use an endovascular procedure and of the 79% of patients who were recanalized, 76% of them had good to moderately good clinical outcomes. The trial court disregarded this article, though, because the patients also received a thrombolytic agent in addition to the endovascular procedure. We conclude that the trial court overreached its role as gatekeeper in the circumstances presented in this case.

Again, "the trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Unger*, 278 Mich App at 217 (quotation marks and citation omitted). We conclude that Dr. Zoarski's opinion in this case is rationally derived from a sound foundation, see *id*., in that it is based on medical literature that was available at the time of plaintiff's hospitalization which shows that recanalization of the basilar artery is achievable in a majority of cases like plaintiff's case, and more likely than not would have resulted in a more favorable functional outcome. Defendants can, of course, challenge Dr. Zoarski's testimony through cross-examination and may present testimony and other evidence which conflicts with or contradicts Dr. Zoarski's opinions. In any case, we conclude that the proposed expert witness testimony of Dr. Zoarski in support of plaintiff's endovascular theory of liability met the standards set forth in MRE 702 and MCL 600.2955. In other words, plaintiff may pursue his theory that defendants breached the standard of care by failing to seek a consult with an interventional neuroradiologist and pursue endovascular treatment which would have led to a thrombectomy being performed and more likely than not prevented the recurrent strokes that caused plaintiff's debilitating injuries, i.e., resulted in a better functional outcome. Therefore, the trial court erred in granting defendants' motions for summary disposition premised on the argument that plaintiff's expert opinion as to endovascular treatment was unreliable junk science and must be excluded under MCR 702 and MCL 600.2955. Accordingly, we reverse the trial court's dismissal of plaintiff's claims arising from his endovascular theory of liability and remand for further proceedings on this matter.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction. Plaintiff is entitled to costs as the prevailing party. MCR 7.219(A).


/s/ Sima G. Patel
/s/ Mark J. Cavanagh
/s/ James Robert Redford